**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 22-4136**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAMUEL MANU AGYAPONG, a/k/a Sammy Tuga,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:19-cr-00423-FL-5)

Submitted:  February 9, 2023                                        Decided:  April 4, 2023

Before NIEMEYER, HARRIS, and QUATTLEBAUM, Circuit Judges.

Affirmed by unpublished opinion.  Judge Niemeyer wrote the opinion, in which Judge Harris and Judge Quattlebaum joined.

**ON BRIEF:** W. Michael Dowling, THE DOWLING FIRM PLLC, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, Lucy Partain Brown, Assistant United States Attorney, OFFICE OF UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

NIEMEYER, Circuit Judge:

A jury convicted Samuel Agyapong on nine counts charging him with naturalization fraud, harboring an illegal alien, conspiracy to commit marriage fraud, unlawful disposition of United States property, witness tampering, and false statements, variously in violation of 18 U.S.C. §§ 2, 371, 641, 1001, 1324(a), 1325(c), 1425(a), 1425(b), and 1512(b).  He now appeals, contending solely that the jury had insufficient evidence with which to convict him.  We affirm.

"A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden."  *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (cleaned up).  Following a jury trial, "[w]e do not reweigh the evidence or the credibility of witnesses, but assume that the jury resolved all contradictions in the testimony in favor of the Government."  *United States v. Roe*, 606 F.3d 180, 186 (4th Cir. 2010).  Also, we must "allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established."  *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982).  Accordingly, when reviewing a verdict for the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

This case was tried before a jury over the period of a week, with testimony presented through numerous witnesses, both for the prosecution and the defense.  The record shows that Samuel Agyapong ("Sam"), a native of Ghana, joined the U.S. Army, and, while stationed in Italy, he became a naturalized U.S. citizen.  Several months after becoming a

2

citizen, Sam traveled briefly to New York City and, on January 13, 2015, married Barbara Oppong ("Barbara"), a fellow Ghanian native. After the wedding, Sam returned to Italy. In December 2015, Sam returned from Italy to his base at Fort Bragg in Fayetteville, North Carolina. The evidence shows that thereafter, Sam and Barbara hardly lived as husband and wife, communicating with each other almost exclusively about immigration matters while Barbara was in New York and Sam was in North Carolina.

The government presented evidence that neither Sam nor Barbara's motor vehicle license plates were detected on the roads between New York and North Carolina and that Sam had not obtained leave to visit Barbara in New York, as would be expected had their marriage been genuine.

Three months after their wedding, Sam completed an Immigration Form I-130 to begin the process for Barbara to become a U.S. citizen. In the form, Sam listed his address as the same address in New York where Barbara lived, although he was living in North Carolina. He also denied that Barbara had any children when she in fact had two from a previous marriage.

In December 2015, Sam reaffirmed his Army life insurance policy, keeping his half-brother as the beneficiary, rather than naming Barbara. When the Army eventually notified Barbara of this, she told Sam that she approved.

Also in December 2015, Sam applied for a "Basic Allowance for Housing," a monthly allowance that married soldiers receive for off-base housing expenses. The Army began paying him this extra housing allowance and also paid him $22,926 in backpay for the period from January 2015, when he and Barbara had wed.

3

The evidence showed that Sam, while living in North Carolina, attended various celebrations, church events, mentorship gatherings, and other events with friends, some of whom were also soldiers, and that those friends and soldiers stated that they had never met Barbara. The government presented testimony from at least three of them. One such friend was a woman who was not only involved romantically with Sam but also lived with him for a period of time. She testified not only that she never met Barbara but also that she never saw any women's clothing at Sam's house.

When Sam purchased a house in North Carolina, he took the deed in the name "Samuel M. Agyapong, a married man," and then simultaneously filed a deed signed by Barbara conveying the entire property to Sam.

In October 2017, when Sam and Barbara submitted a Homeland Security Form I-751 (Petition to Remove Conditions on Residence), they represented that Sam was living with Barbara in New York and that neither had children, although Sam lived in North Carolina and Barbara had two children.

Later that same year, Sam undertook to help a friend document the validity of a marriage so that the husband could receive legal immigration status and the wife could receive Basic Allowance for Housing. In his letter of support, Sam made false statements about his knowledge of the couple's relationship and his knowledge of one of the persons involved.

Again in August 2018, Sam became close friends with another female soldier who sometimes stayed at his house. That woman testified that she never met Barbara, never heard that Barbara was around or in town, and never saw any items in Sam's house that

4

could have been Barbara's. Sam also sought to persuade this friend to engage in a blind marriage with a friend, for which she would be paid $3,600. Ultimately, she backed out of the proposed arrangement.

In late 2018, more than three years after their marriage, Sam and Barbara exchanged text messages in which Sam asked Barbara information that he should have known had their marriage been genuine. Specifically, he asked for her birthday, her email address, and whether she spoke Ga, a Ghanian language.

A few months later and with Sam's assistance, Barbara completed Homeland Security Form N-400 for her naturalization. Shortly before she did so, Sam sent her text messages confirming that they could "start working on citizenship now." To be approved as a citizen, Barbara had to represent that she and Sam were married and that they were living together. Barbara stated falsely that she had been living with Sam in New York since 2014 and that she had no children. As required by the form, Sam provided Barbara with a copy of his naturalization certificate.

In February 2019, Army Criminal Investigation Division ("CID") agents went to New York to question Barbara. In response to their questions, Barbara said that she had arrived in New York from Ghana in 2009; that she met Sam at a party in New York; and that she married him several months later. She also told them that Sam lived in North Carolina and that they visited each other about every two weeks. She again denied having any children. The CID agents came away from the interview believing that Barbara's answers had been rehearsed. They also proved to be untrue.

On the same day that the CID agents questioned Barbara, Homeland Security agents questioned Sam, but their questioning of Sam was several hours later. During that questioning, they inspected Sam's cell phone and saw text messages from Barbara that had been sent immediately after the completion of Barbara's questioning by CID agents. Her messages read, "College of Mt. Saint . . . Riverdale Branch. We met at a party. You rarely give me money. My landlord is from Nigeria. We married four years ago at my lawyer's office . . . I have known you for 4 ½ years." She included a picture of the CID agent's card. When Homeland Security agents asked Sam the name of his wife's school, he could not provide it. He also stated that he did not know the name of anyone who attended his wedding. The agents concluded that Barbara was "providing answers to [Sam] that if somebody were to come and question him later, he would then know those answers." Later that night, Sam borrowed a friends phone to call a close friend, who came over to Sam's house, where the two, according to the first friend, appeared to talk about the investigation with "concern[]" in a foreign language.

About a year later, after one of Sam's girlfriends was subpoenaed to testify before a grand jury, she asked Sam why he had never told her that he had been married. The two then talked about the subpoena, and Sam instructed her "to deny any part of any dealings [they] had with each other," which the girlfriend knew, as she later testified, "would have been perjury." In a later recorded phone conversation, Sam told the girlfriend to say they were "just hanging out" and "to not say anything further than that." Sam later offered the girlfriend money for an attorney and asked her to delete their text messages from her phone.

6

The evidence showed that Sam was not only misrepresenting his circumstances but also that, even after he was first interviewed by law enforcement, he was involved in arranging sham marriages, as an undercover law enforcement officer posing as the bride was invited to Sam's house to "celebrate the fake marriage operation."

Based on this evidence, a jury could well conclude that Sam and Barbara's marriage was a sham and was entered into to enable Barbara to become a U.S. citizen and for Sam to obtain financial benefits. The jury could also conclude that Sam helped others with using sham marriages for immigration purposes. Finally, it could conclude that Sam made many false statements to the government. We conclude that this evidence was sufficient to support Sam's convictions.

On appeal, Sam focuses on a couple of points, arguing, for instance, that the evidence failed to show the necessary intent with respect to his purportedly sham marriage, contending that it was originally genuine and only later deteriorated. He also argues that the evidence was lacking to show his financial motivation for entering the marriage. But these arguments overlook several items of evidence. For instance, Barbara's answers to CID agents' questions revealed their joint intent for a sham marriage from the beginning. She stated that she met Sam at a party in New York a few months before their wedding in January 2015. Yet the evidence showed that during that entire time — going back to November 2013 — Sam had been stationed in Italy and that he did not travel to New York except for the wedding itself. Also the evidence showed that Sam and Barbara repeatedly gave fake information and coordinated their coverup of the facts, supporting guilty

7

knowledge. Finally, the evidence showed that Barbara *never* lived with Sam in North Carolina, or even visited him there, in the years after he returned from Italy in 2015.

As to financial motives, again the evidence was sufficient. After his marriage, Sam excluded Barbara from his life insurance policy and from ownership of the house he purchased while married. Moreover, relying on the marriage, Sam sought and obtained an Army housing allowance, including a backpay payment of over $20,000.

Also, when Barbara sought to become a U.S. citizen based on her marriage to Sam, Sam was complicit in the false statements on her application, which represented that Sam lived in New York with Barbara and that Barbara had no children.

At bottom, the government established with sufficient evidence that the substance of the relationship between Sam and Barbara related only to immigration matters for Barbara and financial benefits for Sam.

Sam's burden in challenging the sufficiency of the evidence is an especially difficult one to carry in this case, recognizing that the jury heard all of this evidence and more and that Sam presented all of his arguments with respect to that evidence. Yet the jury found him guilty of the crimes charged. Based on the record, we are not in a position to second guess the jury.

The judgment of the district court is

AFFIRMED.